1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8    JANE DOE,

9                          Petitioner,          Case No. C24-0326-JLR-SKV

10         v.                                   REPORT AND RECOMMENDATION

11    DREW BOSTOCK, et al.,

12                          Respondents.

13

14                              INTRODUCTION

15         Petitioner Jane Doe is an immigration detainee in U.S. Immigration Customs and

16    Enforcement (ICE) custody at the Northwest ICE Processing Center (NWIPC) in Tacoma,

17    Washington.  Proceeding through counsel, Petitioner filed a habeas petition pursuant to 28

18    U.S.C. § 2241 and complaint for declaratory and injunctive relief seeking her immediate release

19    from detention or, in the alternative, a bond hearing.  Dkt. 1.[1]  Petitioner also filed a Motion for a

20    Temporary Restraining Order (TRO) requesting the same relief.  Dkt. 2.

21

22

23         _____

              [1] Petitioner identifies herself as "Petitioner-Plaintiff", Respondents as "Respondents-Defendants",
        and her pleading as a habeas petition and complaint.  Dkt. 1.  The Court, for the sake of simplicity, refers
        to the parties as "Petitioner" and "Respondents" and to the petition/complaint as the "petition."

REPORT AND RECOMMENDATION - 1

The Court addresses the motion for a TRO in this Report and Recommendation. In the motion, Petitioner argues she should be released because her conditions of confinement are punitive and violate the Rehabilitation Act. Dkt. 2. She asserts that she cannot receive necessary psychological treatment while detained and while she perceives an active risk of harm at NWIPC, and that she is not receiving necessary medical care. Petitioner alternatively seeks an order directing that she be provided with a bond hearing due to her prolonged detention. Respondents oppose Petitioner's motion. Dkt. 8.

The Court, having now considered the parties' submissions, the balance of the record, and the governing law, herein recommends that Petitioner's Motion for a TRO, Dkt. 2, be DENIED for the reasons discussed below.[2]

BACKGROUND

A.    Immigration-Related Events and Proceedings

Petitioner is a native and citizen of Mexico and originally entered the United States without inspection in or around 1994, when she was approximately two years old. *See* Dkt. 1-3 (Declaration of Susan Beaty), ¶4; Dkt. 9 (Declaration of Michael Winkle), ¶3. Petitioner was first placed into removal proceedings in 2001, when her stepfather included her on his asylum application. Dkt. 1-3, ¶4. After Petitioner disclosed sexual abuse by her stepfather, an Immigration Judge (IJ) terminated the proceedings so that Petitioner could apply for a U visa. *Id*. She was granted a U visa in 2010 and adjusted her status to lawful permanent resident (LPR) on September 27, 2011. *Id*.; Dkt. 9, ¶3.

---

[2] Petitioner's request for oral argument, which she included in both her petition and TRO motion, *see* Dkts. 1 & 2, is DENIED. The parties have thoroughly briefed the issues and oral argument would not be of assistance to the Court. *Cf. Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998) (court may deny request for oral argument on motion for summary judgment when parties submit briefs to the court). *See also* Local Civil Rule 7(b)(4) ("Unless otherwise ordered by the court, all motions will be decided by the court without oral argument.")

1    On November 9, 2018, Petitioner applied for admission at the San Ysidro Port of Entry as

2    a LPR. Dkt. 9, ¶4. Inspecting officers found forty packages containing more than twenty

3    kilograms (over forty-five pounds) of methamphetamine concealed in her vehicle. *Id*. Petitioner

4    told investigators she agreed to smuggle the controlled substance into the United States in return

5    for payment, and had recruited the vehicle passenger to accompany her in return for a share in

6    the payment. *Id*. Petitioner was, on that same day, paroled into the United States for criminal

7    prosecution. *Id*.

8    On August 2, 2019, Petitioner was convicted in the United States District Court for the

9    Southern District of California for violation of 21 U.S.C. §§ 952, 960, and sentenced to fifty

10    seven months imprisonment and four years supervised release. *Id*., ¶5. On November 25, 2022,

11    Petitioner was released from the Federal Correctional Institution, Dublin (FCI Dublin) to ICE

12    custody, served by the Department of Homeland Security with a Notice to Appear, and

13    transferred to NWIPC. *Id*., ¶6. Upon her arrival at NWIPC, which is a private detention center

14    run by The Geo Group, Inc. (GEO), ICE reviewed Petitioner's case in compliance with ICE

15    Directive 11005.3, *Using a Victim-Centered Approach with Noncitizen Crime Victims*, and

16    determined her continued detention was warranted. *Id*., ¶7.

17    The Notice to Appear charged Petitioner as inadmissible pursuant to INA §§

18    212(a)(2)(A)(i)(I) (crime involving moral turpitude), 212(a)(2)(A)(i)(II) (controlled substance

19    conviction), and 212(a)(2)(C)(i) (reason to believe/drug trafficker). *Id*., ¶6. In a master calendar

20    hearing on March 14, 2023, Petitioner admitted to the allegations in the Notice to Appear and the

21    IJ sustained all charges. *Id*., ¶8.[3] During the same hearing, Petitioner filed an application for

22    relief from removal. *Id*. In her application, Petitioner asserts that her deportation to Mexico

23    _____

[3] In some instances, declarations submitted by the parties contain different dates or details for various events. The Court anticipates that any future briefing in this matter will provide clarification.

1    poses a high risk of her torture or death by her abusive former partners, their cartel associates,

2    and Mexican government officials, based on her experiences of gender-based violence, criminal

3    record, cooperation with the federal government, numerous tattoos, and LGBTQ identity.  *See*

4    Dkt. 1-3, ¶17.

5    　　　　The IJ held individual hearings on Petitioner's request for relief on December 6, 2023

6    and March 12, 2024.  Dkt. 9, ¶10.  Petitioner's second hearing was continued for additional

7    testimony and a future hearing date has not yet been set.  *Id*.  Her removal proceedings have been

8    continued seven times, at her request or upon motion by her counsel.  *Id*., ¶9 (continuances

9    granted on January 5, 2023, January 18, 2023, January 31, 2023, February 22, 2023, March 14,

10   2023, April 18, 2023, and July 27, 2023).

11   　　　　Petitioner has not, during the removal proceedings, requested a bond hearing.  *Id*., ¶13.

12   Petitioner has, through counsel, submitted multiple requests for release to ICE's Enforcement

13   and Removal Operations and requests for prosecutorial discretion to ICE's Office of the

14   Principal Legal Advisor.  Dkt. 1-3, ¶¶6-8, 10, 15, 25, 36-37; Dkt. 9, ¶14.  All of those requests

15   have been denied.  *See id*.  Petitioner also, on February 1, 2024, received a new U visa

16   certification.  Dkt. 1-3, ¶41.

17   B.　　Allegations of Sexual Abuse at NWIPC

18   　　　　Petitioner alleges she was twice inappropriately sexually touched by the same GEO

19   officer at NWIPC.  *See* Dkt. 1-2 (Declaration of Jane Doe), ¶¶40-42.  She alleges that, in a pat

20   down search in August 2023, the officer groped her with flat palms all over her body, including

21   her breasts and in between her legs.  *Id*., ¶40.  She alleges that, in a previous incident shortly

22   after her arrival at NWIPC, the same officer woke her up by "grabbing and touching [her] butt

23   and thigh, instead of her shoulder or back, as the guards normally do."  *Id*., ¶42.

1    During the pat down incident, on August 11, 2023, a female GEO officer conducted a

2    search of Petitioner prior to placing her in the intake holding cell at NWIPC.  Dkt. 9, ¶15.  The

3    officer discovered a small bag containing crushed medication, as well as pills in an address book

4    Petitioner was carrying.  *Id*.  Petitioner was transferred to the administrative segregation unit

5    pending an investigation into disciplinary charges for violating facility rules prohibiting

6    possession of narcotics and misuse of medication.  *Id*.  On August 14, 2023, following an

7    investigation and written notification, Petitioner appeared before a disciplinary panel and was

8    found guilty of misuse of medication.  *Id*., ¶¶16-19.  She was not found guilty of possession of

9    narcotics because the medication at issue – Trileptal, a medication for which Petitioner had a

10   prescription, but was required to take at a "pill line" – is not a narcotic.  *Id*., ¶19.

11   On August 15, 2023, Petitioner filed a written grievance with GEO complaining about

12   the pat down search.  *Id*., ¶20.  Thereafter, NWIPC initiated Sexual Abuse and Assault

13   Prevention and Intervention (SAAPI) protocols, assigned a SAAPI investigator, and prohibited

14   the GEO officer who performed the pat down from contact with Petitioner or entering the

15   secured side of the facility during the investigation.  *Id*.  On August 16, 2023, NWIPC notified

16   ICE of Petitioner's complaint, elevated the complaint to the Joint Intake Center, and Petitioner

17   was evaluated by medical and mental health providers.  *Id*., ¶21.  On completion of the

18   investigation, which included review of the video camera footage of the pat down search,

19   Petitioner's allegations were deemed unfounded.  *Id*., ¶22 (stating that the video showed the

20   GEO officer found contraband during a properly conducted pat down search) and ¶24 (stating

21   that the video shows the officer used the back of her hand, not her palm, during the search).  ICE

22   completed a management inquiry with Prison Rape Elimination Act (PREA) findings, which was

23

1   elevated to ICE's Management Inquiry Unit. *Id.*, ¶23.  That inquiry culminated in the conclusion

2   that Petitioner had not been sexually assaulted by the GEO officer.  *Id.*

3       Petitioner does not provide any other details relating to an alleged earlier incident with

4   the same GEO officer.  *See* Dkt. 1-2, ¶42; Dkt. 9, ¶25 (noting the absence of a date, timeframe,

5   or witnesses that could be used to investigate this claim).  However, Respondents note an

6   absence of any other grievances or complaints from Petitioner alleging inappropriate contact by

7   GEO or ICE employees, and that the officer involved in the August 2023 pat down began her

8   employment on June 5, 2023, approximately six months after Petitioner arrived at the facility,

9   and stopped working at NWIPC at the end of February 2024.  Dkt. 9, ¶¶25-30.

10  C.   Allegations Regarding Medical Issues at NWIPC

11      Petitioner alleges deliberate indifference to her serious medical needs and violations of

12  the Rehabilitation Act.  *See* Dkt. 1 & Dkt. 1-2.  As related to her mental health, Petitioner has

13  been diagnosed with post-traumatic stress disorder (PTSD), chronic, with dissociative symptoms,

14  panic disorder, and major depressive disorder, and is described as currently psychiatrically

15  decompensating and experiencing chronic and worsening suicidal ideation, auditory

16  hallucinations, chronic dissociation, chronic hypervigilance, and frequent panic attacks.  Dkt. 1-4

17  (Report of Psychological Evaluation by Dr. Kathryn Thomas), ¶¶8, 35-41.  *See also* Dkt. 1-2 &

18  Dkt. 14-1 (Supplemental Psychological Report of Dr. Thomas).  Petitioner asserts a long history

19  of mental illness, drug addiction, childhood sexual abuse, and domestic violence, as well as

20  sexual abuse by officers at both NWIPC and FCI Dublin.  *See* Dkt. 1-2.  She contends that she

21  has not received sufficient mental health care at NWIPC, cannot receive the care she needs to

22  stabilize while remaining in custody, and that her worsening health has interfered with her ability

23  to work with her lawyers and testify in immigration proceedings.  *See* Dkts. 1-2 – 1-4.

1    Petitioner's challenge to her mental health care includes the discontinuation of her

2  treatment with Trileptal and Suboxone.  Petitioner was, prior to her November 2022 NWIPC

3  admission, prescribed a low dose of Buprenorphine, which is a combination of Suboxone and

4  Naloxone and used as a medication-assisted treatment (MAT) for opioid use disorder.  Dkt. 10

5  (Declaration of Eddie Ling-Tse Wang), ¶11.  ICE Health Service Corps does not yet have a

6  national policy providing for MAT treatment and NWIPC is not a MAT certified facility.  *Id.*

7  However, NWIPC allows arriving detainees to be maintained on this treatment temporarily and

8  eventually tapered off.  *Id.*  Upon her request and based on her belief her release was imminent,

9  Petitioner was allowed to continue on Buprenorphine for over five months after her admission.

10  *Id.*, ¶13.  The medication was tapered beginning on May 11, 2023, discontinued ten days later,

11  and Petitioner's request to resume the treatment was denied.  *Id.*, ¶¶14-16.  Also, after the August

12  2023 infraction for misuse of medication, NWIPC altered Petitioner's Trileptal prescription to

13  provide that she could only take it in crushed form at the pill line and Petitioner refused to

14  continue taking the medication in that altered form.  *Id.*, ¶¶53-54.  She may request to resume the

15  prescription by meeting with the facility psychiatrist.  *Id.*, ¶55.

16    Petitioner further asserts that she is scheduled for mental health appointments "every one

17  or two months, but these are inconsistent and short (under thirty minutes)[,]" and that her most

18  recent appointment was not helpful "because the provider did not listen to me, she just talked to

19  me about herself."  Dkt. 1-2, ¶¶21-22.  Respondents assert that mental health appointments are

20  available to Petitioner on a regular basis, that records show she has a history of refusing to attend

21  some of her scheduled appointments, and that Petitioner may request additional appointments at

22  any time by visiting the medical clinic during sick call and speaking with a provider, or by

23  submitting a written request.  Dkt. 9, ¶¶48-52.

1      Petitioner also identifies multiple physical health conditions, including severe abdominal

2   pain related to two hernias, delay in receiving surgery, and a current post-surgical infection that

3   is painful, inadequately treated, and poses a risk of serious harm without sufficient care.  *See*

4   Dkt. 1-2, ¶¶24-39 & Dkt. 1-5 (Declaration of Dr. Anjali Mahoney).  Respondents describe

5   medical care provided, including medical appointments, surgery, prescriptions with antibiotics,

6   and two occasions on which Petitioner was transported to a hospital emergency room and

7   discharged with direction to continue on prescribed antibiotics.  Dkt. 10, ¶¶17-42.

8                                                     DISCUSSION

9   A.    Legal Standard

10     The standard for issuing a TRO is "substantially identical" to the standard for issuing a

11   preliminary injunction.  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7

12   (9th Cir. 2001).  To obtain injunctive relief, a party must demonstrate:  (1) a likelihood of

13   success on the merits; (2) the likelihood of suffering irreparable harm in the absence of

14   preliminary relief; (3) the balance of equities tips in her favor; and (4) an injunction is in the

15   public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Alternatively,

16   "'if a plaintiff can only show that there are serious questions going to the merits – a lesser

17   showing than likelihood of success on the merits – then a preliminary injunction may still issue if

18   the balance of hardships tips *sharply* in the plaintiff's favor, and the other two *Winter* factors are

19   satisfied.'"  *Alliance for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (quoted

20   sources omitted).  A preliminary injunction is "'an extraordinary and drastic remedy, one that

21   should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'"

22   *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoted source omitted; emphasis added by

23   Supreme Court).  *See also Winter*, 555 U.S. at 24 ("A preliminary injunction is an extraordinary

1    remedy never awarded as of right.").

2        In considering whether injunctive relief is appropriate, the Court must also consider the

3    nature of the injunction requested. A mandatory injunction "orders a responsible party to take

4    action," while a prohibitory injunction "prohibits a party from taking action and preserves the

5    status quo" while litigation is pending. *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053,

6    1060 (9th Cir. 2014) (internal quotation marks and quoted source omitted). A mandatory

7    injunction, which goes beyond maintaining the status quo, is particularly disfavored. *Marlyn*

8    *Nutraceuticals, Inc. v. Mucas Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009). "In

9    general, mandatory injunctions 'are not granted unless extreme or very serious damage will

10   result and are not issued in doubtful cases or where the injury complained of is capable of

11   compensation in damages.'" *Id*. (quoted sources omitted). Also, where a mandatory injunction

12   is sought, a party "must establish that the law and facts *clearly favor* her position, not simply that

13   she is likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

14       In this case, Petitioner seeks injunctive relief in the form of immediate release from

15   detention or, in the alternative, a bond hearing. Petitioner, in other words, seeks to expedite the

16   relief requested in her petition. Because she seeks the ultimate relief requested, and not merely

17   to maintain the status quo, Petitioner seeks a mandatory injunction and her request is subject to a

18   higher degree of scrutiny and requires a greater showing.[4]

19       / / /

20

21       [4] Given the greater showing required, courts have declined to apply the alternative, "serious
     questions" preliminary injunctive relief standard to cases involving mandatory injunctions. *See, e.g.*,
22   *Maney v. Brown*, 516 F. Supp. 3d 1161, 1172 n.8 (D. Or. 2021) (citing *P.P. v. Compton Unified Sch.*
     *Dist.*, 135 F. Supp. 3d 1126, 1135 (C.D. Cal. 2015) ("Because Plaintiffs seek a mandatory injunction, the
23   Court declines to interpret the 'serious questions' standard for purposes of the Motion as inconsistent with
     the Ninth Circuit's guidance that a mandatory injunction not issue in 'doubtful cases' and not be granted
     'unless the law and facts clearly favor the moving party.'")). The Court, accordingly, herein addresses
     Petitioner's request for mandatory injunctive relief under the test set forth in *Winter*.

REPORT AND RECOMMENDATION - 9

1    B.    <u>Likelihood of Success on the Merits</u>

2        To succeed on her habeas petition, Petitioner must show she is in custody in violation of

3    the Constitution or laws or treaties of the United States.  *See* 28 U.S.C. § 2241.  Petitioner here

4    seeks her immediate release from immigration detention based on her allegations that her

5    conditions of confinement violate the Fifth Amendment and the Rehabilitation Act, or, in the

6    alternative, seeks a bond hearing based on her prolonged detention.  Respondents argue that

7    Petitioner fails to demonstrate her entitlement to such relief.

8        A likelihood of success on the merits is the most important *Winter* factor and, where a

9    party fails to satisfy this threshold showing, the Court need not consider the remaining factors.

10   *Garcia*, 786 F.3d at 740.  Because Petitioner seeks a mandatory injunction, her burden is even

11   greater; she must establish that the law and facts clearly favor her position, not simply that she is

12   likely to succeed.  *Id*.  The Court concludes that Petitioner fails to meet this burden.

13       1.    <u>Request for Release</u>:

14       Petitioner argues that the conditions of her confinement:  (1) violate the Fifth

15   Amendment because the threat of sexual abuse she is experiencing at NWIPC constitutes

16   punishment and medical staff have been deliberately indifferent to her medical needs; and (2)

17   violate the Rehabilitation Act because, due to her psychologically decompensated state, she is

18   unable to meaningfully participate in her removal proceedings while detained.  She asserts that

19   both of these violations support her immediate release as a remedy.

20       In considering whether Petitioner establishes a likelihood of success in relation to her

21   conditions of confinement claims, the Court must first clarify the nature of those claims and their

22   consideration within the context of this immigration habeas proceeding.  As traditionally

23   understood, challenges to the legality or duration of confinement are pursued in a habeas

1   proceeding, *see Crawford v. Bell*, 599 F.2d 890, 891 (9th Cir. 1979), while challenges to

2   conditions of confinement are pursued in a civil rights action, *see Badea v. Cox*, 931 F.2d 573,

3   574 (9th Cir. 1991).  This Court has, accordingly, found that a habeas petitioner's challenges to

4   conditions of confinement were not properly pursued in an action proceeding under 28 U.S.C. §

5   2241.  *See, e.g., Calderon-Rodriguez v. Wilcox*, 374 F. Supp. 3d 1024, 1038 (W.D. Wash. 2019)

6   (finding noncitizen's claim in his 28 U.S.C. § 2241 petition that his detention, "given its length,

7   multiple transfers, housing among criminal detainees and prisoners, and 70 days in solitary

8   confinement," had "crossed the line into punishment[,]" did not belong in an immigration habeas

9   action) (citing *Badea*, 931 F.2d at 574).

10          However, as Respondents concede, it does not appear that Petitioner seeks to raise a civil

11   rights challenge to the conditions of her confinement.  She does not, for example, seek any

12   improvement in the conditions she challenges and/or damages for constitutional violations

13   alleged.  *See* Dkt. 1 at 50-51.  *See also Crawford*, 599 F.2d at 891 (where a habeas petitioner did

14   not challenge the legality of his imprisonment and instead alleged the terms and conditions of his

15   incarceration violated his constitutional rights, "[t]he appropriate remedy for such constitutional

16   violations, if proven, would be a judicially mandated change in conditions and/or an award of

17   damages, but not release from confinement.")  Petitioner, instead, asserts that her continued

18   detention amounts to punishment and deliberate indifference and asserts her entitlement to relief

19   in the form of her immediate release.

20          This Court has, within the context of immigration habeas proceedings, adjudicated Fifth

21   Amendment conditions of confinement claims related to the COVID-19 pandemic.  *See, e.g.,*

22   *Juarez v. Asher*, 556 F. Supp. 3d 1181, 1187-88 (W.D. Wash. 2021) (addressing Fifth

23   Amendment claims regarding the right to reasonably safe conditions); *Ortiz v. Barr*, C20-0497-

1    RSM-BAT, 2020 WL 13577427, at *6-7 (W.D. Wash. Apr. 10, 2020) (addressing Fifth

2    Amendment claim that detention amounted to punishment).  *See also Dawson v. Asher*, C20-

3    0409-JLR-MAT, 2020 WL 1704324, at *8-9 (W.D. Wash. Apr. 8, 2020) (explaining the

4    circumstances under which the Court undertook consideration of COVID-19-related conditions

5    of confinement claims in petitions brought under 28 U.S.C. § 2241).[5]  Respondents argue that

6    those cases were decided under unique circumstances not present here, and that the Court should

7    decline to extend such consideration to the different circumstances at issue in Petitioner's case.

8         The Court finds no need to determine whether Petitioner's claims are properly considered

9    within the context of 28 U.S.C. § 2241.  The Court, instead and as discussed below, concludes

10   that, even assuming without deciding that it would be appropriate for Petitioner to raise her

11   conditions of confinement claims in a § 2241 habeas petition, Petitioner fails to demonstrate her

12   entitlement to the extraordinary relief requested.

13        a.    Fifth Amendment claims:

14        When the government detains a person pursuant to an immigration violation, the person

15   is a civil detainee.  *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).  To evaluate the

16   constitutionality of civil detention conditions under the Fifth Amendment, a district court must

17   determine whether those conditions "amount to punishment of the detainee."  *Bell v. Wolfish*,

18

19   ───────────────

20   [5] As explained by the Court, while neither the United States Supreme Court, nor the Ninth Circuit
     has resolved the question of whether a conditions of confinement claim may be brought in the form of a
     petition for a writ of habeas corpus, *see Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979), and *Nettles v.
21   Grounds*, 830 F.3d 922, 931 (9th Cir. 2016), the majority of federal circuit courts allow detainees to
     challenge their conditions of confinement through a habeas petition.  *Dawson*, 2020 WL 1704324, at *8
22   (citations to other circuit court decisions omitted).  As further explained by the Court, although the Ninth
     Circuit transferred several COVID-19-related emergency motions to the Court to be adjudicated as
     petitions for writs of habeas corpus under 28 U.S.C. § 2241, the transfer orders were unpublished and did
23   not "resolve this unsettled area of law." *Id.* at *9.  However, given the similarity between the transferred
     emergency motions and the new petition raising Fifth Amendment challenges to COVID-19-related
     conditions, the Court considered the petition in *Dawson* under the rubric of 28 U.S.C. § 2241.  *Id.*

1   441 U.S. 520, 535 (1979); *see also Kingsley v. Hendrickson*, 576 U.S. 389, 397-98 (2015).

2   Punishment may be shown through an express intent to punish or a condition that is not

3   "reasonably related to a legitimate governmental objective."  *Bell*, 441 U.S. at 539; *see also*

4   *Kingsley*, 576 U.S. at 398 (clarifying that "a pretrial detainee can prevail by providing only

5   objective evidence that the challenged governmental action is not rationally related to a

6   legitimate governmental objective or that it is excessive in relation to that purpose").

7          In addition, "when the State takes a person into its custody and holds him there against

8   his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for

9   his safety and general well-being."  *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S.

10  189, 199-200 (1989).[6]  Thus, for example, the government violates the Due Process Clause if it

11  fails to provide civil detainees with "food, clothing, shelter, medical care, and reasonable safety."

12  *Id.* at 200.  Claims involving the right to adequate medical care "must be evaluated under an

13  objective deliberate indifference standard."  *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124-

14  1125 (9th Cir. 2018) ("[T]he Supreme Court has treated medical care claims substantially the

15  same as other conditions of confinement violations including failure-to-protect claims.")

16         In this case, Petitioner does not present allegations or evidence to show an "express

17  intent" to punish.  Moreover, preventing detained noncitizens from absconding, ensuring that

18  they appear for removal proceedings, and protecting the public are legitimate governmental

19  objectives.  *See Jennings v. Rodriguez*, 583 U.S. 281, 285 (2018); *Demore v. Kim*, 538 U.S. 510,

20  520-22 (2003); *Zadvydas*, 533 U.S. at 690-91.  Further, while it is undisputed that inappropriate

21

22

23         [6] In *DeShaney*, 489 U.S. at 194-95, the Supreme Court analyzed the petitioners' rights under the Fourteenth Amendment.  Fifth Amendment due process claims and Fourteenth Amendment due process claims are analyzed in the same way.  *See Paul v. Davis*, 424 U.S. 693, 702 n.3 (1976).

1    sexual contact does not further a governmental purpose, Petitioner does not demonstrate that she

2    is likely to succeed in showing her continued detention at NWIPC constitutes punishment.

3         Petitioner, for example, asserts that she was twice subjected to "punishing sexual

4    conduct" by the same GEO officer.  Dkt. 2 at 13.  She asserts that the officer, soon after

5    Petitioner arrived at the facility, woke her up by "grabbing and touching [her] butt and thigh,"

6    and later "groped" her with "flat palms" all over her body and between her legs during a pat

7    down.  Dkt. 1-2, ¶¶40, 42.  Petitioner asserts that this officer still works at NWIPC, exacerbating

8    her symptoms of panic and dissociation, and that she actively fears further sexual abuse.  Dkt. 2

9    at 13.  *See also* Dkt. 1-4, ¶33.  However, Respondents provide a declaration reflecting that an

10   investigation into the pat down resulted in a determination that Petitioner's allegations were

11   unfounded, that video footage shows the officer properly conducted the search using the back of

12   the officer's hands, and that the officer no longer works at NWIPC.  Dkt. 9, ¶¶15-24 (also

13   observing that the officer did not begin her employment at the facility until more than six months

14   after Petitioner arrived, and describing the investigation into and disciplinary charges resulting

15   from the officer finding crushed medication and pills during the pat down, as well as the safety,

16   medical, and mental-health related protocols that followed Petitioner's filing of a grievance).

17   The facts before the Court do not, in other words, favor Petitioner's claim that her continued

18   detention at NWIPC constitutes punishment.

19        Petitioner likewise fails to show a likelihood of success in relation to her medical care.

20   To establish deliberate indifference, Petitioner must show:  (1) Respondents made an intentional

21   decision with respect to conditions of confinement; (2) the decision put her at substantial risk of

22   suffering serious harm; (3) Respondents did not take reasonable available measures to abate that

23   risk; and (4) the failure to mitigate the risk caused Petitioner's injuries.  *Sandoval v. County of*

1    *San Diego*, 985 F.3d 657, 669 (9th Cir. 2021) (citing *Gordon*, 888 F.3d at 1125).  Satisfaction of

2    the third element requires a showing that the defendant's actions were "'objectively

3    unreasonable'" meaning "'more than negligence but less than subjective intent – something akin

4    to reckless disregard.'" *Id*. (quoted sources omitted).  A "'mere lack of due care'" is not

5    sufficient.  *Gordon*, 888 F.3d at 1125 (quoted sources omitted).

6            Petitioner asserts that she has been denied medically necessary care throughout her

7    detention and currently faces multiple severe risks to her life and health, including increasing

8    risk of death by suicide, hallucinations, dissociation, and other symptoms of cognitive

9    decompensation, as well as an infected surgical abscess on her abdomen.  However, as with her

10   claim of punishment, the facts before the Court do not favor Petitioner's claim of deliberate

11   indifference.  For example, Petitioner asserts that she is not receiving any psychiatric medication

12   and that her prescriptions for Suboxone and Trileptal were discontinued against her wishes.  Dkt.

13   1-2, ¶¶20-21; Dkt. 1-4, ¶¶31-32.  However, a declaration provided by Respondents reflects that

14   Petitioner was permitted to remain on Suboxone to manage her substance abuse withdrawal

15   symptoms for over five months after her admission, but that it was thereafter tapered and

16   discontinued in accordance with ICE policies and practices; that Petitioner refused to continue

17   taking Trileptal after she was infracted for misuse of that medication and her prescription was

18   altered such that she could only take it in crushed form, at the pill line; and that Petitioner can

19   request resumption of Trileptal by meeting with the facility psychiatrist.  Dkt. 10, ¶¶11-16, 48-

20   49, 53-55 (also stating that Petitioner has a history of refusing to attend some mental health

21   appointments, refused her last scheduled appointment with the psychiatrist on February 29, 2024,

22   and that she may request additional mental health appointments at any time).  Also, while

23   Petitioner asserts that treatment of her infection was delayed by the NWIPC medical unit,

1    continues to worsen, and that she is in considerable pain, Dkt. 1-2, ¶¶37-38; Dkt. 1-5, ¶16, the

2    declaration from Respondents describes treatment provided as including prescriptions with

3    antibiotics, multiple appointments at NWIPC, and two occasions on which Petitioner was

4    transported to a hospital emergency room and discharged with direction to continue on

5    prescribed antibiotics.  Dkt. 10, ¶¶35-42.

6           The Court, finally, does not find support for Petitioner's contention that demonstration of

7    the alleged Fifth Amendment violations would allow for her immediate release.  Instead, as

8    previously found by this Court, "[e]ven if Petitioner could show a Fifth Amendment violation,

9    [she] does not establish that such a violation would justify immediate release, as opposed to

10   injunctive relief that would leave [her] detained while ameliorating any unconstitutional

11   conditions at the NWIPC."  *Ortiz*, 2020 WL 13577427, at *7 n.8.

12                    b.      Rehabilitation Act claim:

13          The Rehabilitation Act forbids federal agencies from discriminating against people with

14   disabilities.  29 U.S.C. § 794(b)(2)(B).  Pursuant to Section 504 of the Act, "no otherwise

15   qualified individual with a disability . . . shall, solely by reason of her or his disability, be

16   excluded from the participation in, be denied the benefits of, or be subjected to discrimination

17   under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  To

18   establish a violation of Section 504, a plaintiff must show:  (1) she is an individual with a

19   disability; (2) she is otherwise qualified to receive the benefit; (3) she was denied the benefit

20   solely by reason of her disability; and (4) the program receives federal financial assistance.

21   *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001).  The denial of a benefit

22   includes a denial of reasonable accommodation, and a violation would be found if:  (1) the

23   plaintiff needed an accommodation to enjoy meaningful access to benefits; (2) the government

1    was on notice plaintiff needed the accommodation, but did not provide it; and (3) there was a

2    specific reasonable accommodation available.  *Mark H. v. Hamamoto*, 620 F.3d 1090, 1096-97

3    (9th Cir. 2010).

4         In alleging violation of the Rehabilitation Act, Petitioner asserts that she is unable to

5    meaningfully participate in her removal proceedings while detained due to her psychologically

6    decompensated state.  Petitioner specifically asserts that she has been unable to effectively

7    present testimony or work with her counsel, describing, for example, her difficulty in preparing

8    statements for court and testifying, the impacts on her mental health, and her belief she had a

9    panic attack when she last attempted to testify.  Dkt. 1-2, ¶¶44-47; Dkt. 1-3, ¶¶23-31.  She asserts

10   that her PTSD and other mental health symptoms cannot be effectively controlled while she is

11   detained, and that immediate release so that she can obtain stabilizing treatment in the

12   community is the only accommodation that will permit her to participate in her immigration

13   proceedings.  *See* Dkt. 1-3, ¶¶39-53.

14        "The duty to provide 'reasonable accommodations' under . . .  the Rehabilitation Act

15   arises only when a policy discriminates *on the basis of disability*."  *Weinreich v. Los Angeles*

16   *Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997).  Here, even assuming Petitioner's

17   ability to clearly present her testimony and to work with her counsel are construed as "benefits"

18   under the Rehabilitation Act, Petitioner does not show, or even allege, she was denied such

19   benefits "solely by reason" of her disability.  *See, e.g., Fraihat v. U.S. Immigr. & Customs Enf't*,

20   16 F.4th 613, 650 (9th Cir. 2021) ("Plaintiffs at most demonstrated that they were subjected to

21   inadequate national policies that they claimed reflected deliberate indifference to COVID-19;

22   they did not show they were treated differently from other detainees 'solely by reason' of their

23   disabilities.")  Moreover, the Rehabilitation Act "prohibits discrimination *because of* disability,

not inadequate treatment *for* disability." *Roosma v. Pierce Cnty.*, C16-5499-RJB, 2018 WL 784590, at *6 (W.D. Wash. Feb. 8, 2018) (cleaned up; quoting *Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011 (9th Cir. 2010), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016)).  Accordingly, Petitioner's assertion that she can only receive adequate medical treatment upon release, and thus her assertion of inadequate treatment at NWIPC, is not cognizable under the Rehabilitation Act.  Finally, because reasonable accommodation under the Rehabilitation Act does not require "fundamental or substantial alterations" to programs, *Mark H.*, 620 F.3d at 1098, Petitioner does not otherwise support her request for release outside of the context of a removal proceeding.  *See, e.g., Siskos v. Sec'y, Dep't of Corr.*, 817 F. App'x 760, 765 (11th Cir. 2020) (finding no merit in Rehabilitation Act claim alleging a denial of reasonable accommodation through the failure to release an inmate to a residential treatment facility because the requested action would "fundamentally alter the nature" of the correctional department's imprisonment services).

Petitioner, in sum, does not show a likelihood of success in relation to either her Fifth Amendment or her Rehabilitation Act claims.  Moreover, because Petitioner fails to show the facts or law clearly favor any of her claims challenging the conditions of her confinement, the Court need not consider the remaining *Winter* factors in relation to her request for release. *Garcia*, 786 F.3d at 740.

        2.    Request for a Bond Hearing:

Petitioner argues that her prolonged detention violates her right to due process, entitling her to a bond hearing.  Respondents argue that Petitioner's continued mandatory detention is reasonable and comports with due process.

1    In considering these arguments, the Court first briefly addresses the statutory basis for

2    Petitioner's detention.  Three statutes govern immigration detention.  *See* 8 U.S.C. §§ 1225,

3    1226, 1231.  In the motion before the Court, Petitioner asserts that she is currently detained

4    pursuant to § 1226(c), *see* Dkt. 2 at 21; *see also* Dkt. 1-3, ¶35, while Respondents assert that

5    Petitioner is detained pursuant to § 1225(b)(2), Dkt. 8 at 8 & Dkt. 9, ¶6.[7]  The Court will require

6    clarification as to the statutory basis for Petitioner's detention in order to provide a thorough

7    discussion of the applicable law and reach an ultimate determination on the merits of the habeas

8    petition.  There is, however, no dispute that both § 1226(c) and § 1225(b) mandate detention, and

9    that, even if statutorily authorized, Petitioner's detention must comport with due process.

10   Further, and as Respondents observe, both § 1226(c) and § 1225(b) provide for review of a due

11   process challenge in a similar fashion.  *See Martinez v. Clark*, C18-1669-RAJ-MAT, 2019 WL

12   5968089, at *4-9 (W.D. Wash. May 23, 2019), *report and recommendation adopted*, 2019 WL

13   596285 (W.D. Wash. Nov. 13, 2019); *Banda v. McAleenan*, 385 F. Supp. 3d 1099, 1106-07,

14   1113-20 (W.D. Wash. 2019).  Accordingly, for the purpose of considering Petitioner's request

15   for a TRO, the Court herein limits its discussion to the question of whether Petitioner's continued

16   detention without a bond hearing violates due process.

17       District courts that have considered the issue, including judges in this district, "agree that

18   prolonged mandatory detention pending removal proceedings, without a bond hearing, 'will – at

19   some point – violate the right to due process.'"  *Martinez*, 2019 WL 5968089, at *6 (quoting

20   *Sajous v. Decker*, C18-2447, 2018 WL 2357266, at *8 (S.D.N.Y. May 23, 2018), and collecting

21

22   _____

23       [7] In a declaration attached to the petition, counsel for Petitioner in the removal proceedings states: "Because ICE chose to detain [Petitioner] upon release from BOP custody, she is now detained under 8 U.S.C. 1226(c) due to her federal conviction."  Dkt. 1-3, ¶35.  Respondents do not address this statement, and cite only to Petitioner's motion as inaccurately citing § 1226(c) as the basis for her detention.  Dkt. 8 at 14, n.2.

1    cases); *accord Banda*, 385 F. Supp. 3d at 1106-07 ("[U]nreasonably prolonged detention under §

2    1225(b) without a bond hearing violates due process.")  Courts in this district apply a multi-

3    factor test in determining whether a noncitizen detained under § 1226(c) or § 1225(b) is entitled

4    to a bond hearing once detention becomes unreasonably prolonged.  *See Martinez*, 2019 WL

5    5968089, at *6-9, *8 n.8 (applying eight-factor "*Martinez*" test to noncitizens detained under §

6    1226(c)); and *Banda*, 385 F. Supp. at 1106-07 (applying six-factor "*Banda*" test to noncitizens

7    detained under § 1225(b)(1)); *Djelassi v. ICE Field Off. Dir.*, 434 F. Supp. 3d 917, 920-21 (W.D.

8    Wash. 2020) (same).  The Court here finds it appropriate to utilize the *Martinez* test, the test

9    applied by the parties in their briefing.  *See generally Hong v. Mayorkas*, C20-1784-LK, 2022

10   WL 1078627, at *4 (W.D. Wash. Apr. 11, 2022) (noting that "the analysis under each factor is

11   the same regardless of whether it is in the context of the six-factor *Banda* test or all eight

12   *Martinez* factors."), *appeal dismissed sub nom. Yang v. Mayorkas*, No. 22-35458, 2022 WL

13   4127534 (9th Cir. Sept. 6, 2022).[8]

14           Under the *Martinez* test, the Court considers the following factors:

15           (1) the total length of detention to date; (2) the likely duration of future detention;
16           (3) whether the detention will exceed the time the petitioner spent in prison for the
             crime that made him [or her] removable; (4) the nature of the crimes the petitioner
17           committed; (5) the conditions of detention; (6) delays in the removal proceedings
             caused by the petitioner; (7) delays in the removal proceedings caused by the
18           government; and (8) the likelihood that the removal proceedings will result in a
             final order of removal.

19   *Martinez*, 2019 WL 5968089, at *9 (citations omitted).

20

21   _____

22           [8] Respondents analyze the due process claim pursuant to both *Mathews v. Eldridge*, 424 U.S. 319
     (1976), and *Martinez*, 2019 WL 5968089.  Dkt. 8 at 15-18.  However, courts in this district generally
23   decline to apply *Mathews* when, as here, a noncitizen who is subject to prolonged mandatory detention
     has never had a bond hearing.  *See, e.g., Hong*, 2022 WL 1078627, at *4.  *See also Singh v. United States
     Immigr. & Customs Enf't*, C22-0548-BHS-TLF, 2023 WL 4627819, at *6 n.6 (W.D. Wash. Mar. 17,
     2023), *report and recommendation adopted*, 2023 WL 4624478 (W.D. Wash. July 19, 2023).

1

        a.      <u>Length of detention to date</u>:

2      The first factor, the length of detention to date, is the most important one.  *Id*.  Here,

3  because Petitioner has now been detained for over fifteen months, this factor weighs in her favor.

4  *See, e.g., Martinez*, 2019 WL 5968089, at *9 (finding nearly 13-month detention favored

5  granting a bond hearing); *Banda*, 385 F. Supp. at 1118-19 (finding approximate 17-month

6  detention strongly favored granting a bond hearing).

7      b.      <u>Likely duration of future detention</u>:

8      The second factor considers how long the detention is likely to continue absent judicial

9  intervention.  Petitioner asserts that the second factor weighs in her favor because, like the

10  petitioner in *Martinez*, she intends to file any and all appeals available to her if she is not

11  victorious in immigration court.  *See Martinez*, 2019 WL 5968089, at *9 (finding that, where a

12  recently filed BIA appeal could take 6 months or longer, and a subsequent review of a BIA

13  decision could take some 12-20 months from the notice of appeal date, the second factor

14  weighed in favor of granting a bond hearing).  However, unlike the petitioner in *Martinez*, it is

15  not clear whether Petitioner will need to pursue an appeal.  In Petitioner's case, an IJ held two

16  hearings and only recently, on March 12, 2024, continued the case to take additional testimony,

17  without yet setting a new hearing date.  *See* Dkt. 1-3, ¶¶29-34; Dkt. 9, ¶¶8-10; Dkt. 14-2, ¶11.  It

18  is therefore unknown whether Petitioner's removal proceedings will end in her release or in

19  further proceedings, and, therefore, whether an appeal will be necessary.

20      The Court declines to speculate as to the likely duration of future detention and agrees

21  with Respondents that this factor should be neutral.  The Court does, however, find it noteworthy

22  that Petitioner's immigration removal proceedings are in their early stages and could provide for

23  her release.

1

2        c.      Criminal history:

3        Under the third and fourth factors, the Court reviews the length of detention compared to

4   Petitioner's criminal sentence and the nature of her crime.  *Martinez*, 2019 WL 5968089 at *9.

5   "The relevance of these factors is that they are suggestive of whether the detainee is a danger to

6   the community or a risk of flight such that a bond hearing would be futile."  *Barraza v. ICE*

7   *Field Off. Dir.*, No. C23-1271-BHS-MLP, 2023 WL 9600946, at *6 (W.D. Wash. Dec. 8, 2023),

8   *report and recommendation adopted sub nom. Barraza v. United States Immigr. & Customs*

9   *Enf't Field Off. Dir.*, 2024 WL 518945 (W.D. Wash. Feb. 9, 2024).

10       Petitioner's criminal conviction resulted in a 57-month sentence, which exceeds the

11  period of her current detention by a significant amount.  Dkt. 9, ¶5.  Also, Petitioner's conviction

12  resulted from her attempt to bring more than twenty kilograms of methamphetamine into the

13  United States.  *Id*., ¶¶4-5.  Because Petitioner committed a serious crime and was subjected to

14  extensive confinement, the third and fourth factors favor Respondents.

15       d.      Conditions of detention:

16       Under the fifth factor, the Court considers the conditions of Petitioner's detention at the

17  facility where she is currently detained.  "'The more that the conditions under which the [non-

18  citizen] is being held resemble penal confinement, the stronger [the] argument that [she] is

19  entitled to a bond hearing.'"  *Jamal A. v. Whitaker*, 358 F. Supp. 3d 853, 860 (D. Minn. 2019)

20  (quoted source omitted).

21       Petitioner states that, because she is detained at a facility run by a private prison

22  company, she is subject to conditions common in penal environments, such as solitary

23  confinement and the threat of sexual abuse.  She argues that the conditions of her detention are

    therefore "'indistinguishable from criminal incarceration,'" and that the fifth factor "'weighs

strongly in [her] favor." *Zagal-Alcaraz v. ICE Field Off.*, C19-1358, 2020 WL 1862254 (D. Or. Mar. 25, 2020) (quoting *Bolus A.D. v. Sec'y of Homeland Sec.*, 376 F. Supp. 3d 959, 962 (D. Minn. 2019)), *report and recommendation adopted sub nom. Zagal-Alcaraz v. ICE Field Off. Dir.*, 2020 WL 1855189 (D. Or. Apr. 13, 2020).  *Accord Kydyrali v. Wolf*, 499 F. Supp. 3d 768, 773 (S.D. Cal. 2020) (finding detention indistinguishable from penal confinement where detained at private, for-profit detention center operated by company that also runs many state penitentiaries).  Respondents assert that Petitioner bases her allegations on an alleged sexual assault that was investigated and found to be unsubstantiated, and argue the Court should find this factor neutral.

This Court has, upon consideration of evidence provided by the parties, found the conditions at NWIPC, "'similar . . . to those in many prisons and jails[,]'" and the fifth *Martinez* factor to therefore favor a habeas petitioner raising a due process challenge to prolonged detention.  *See, e.g.*, *Katlong v. Barr*, No. C20-0846-RSL-MAT, 2020 WL 7048530, at *4 (W.D. Wash. Oct. 30, 2020) (quoting *Jennings*, 583 U.S. at 329) (Breyer, J., dissenting)), *report and recommendation adopted*, 2020 WL 7043580 (W.D. Wash. Dec. 1, 2020); *Reyes v. Wolf*, C20-0377-JLR-MAT, 2020 WL 6820903, at *7 (W.D. Wash. Aug. 7, 2020), *report and recommendation adopted as modified*, 2020 WL 6820822 (W.D. Wash. Nov. 20, 2020), *enforcement denied*, 2021 WL 662659 (W.D. Wash. Feb. 19, 2021), *aff'd sub nom. Diaz Reyes v. Mayorkas*, No. 21-35142, 2021 WL 3082403 (9th Cir. July 21, 2021).

Petitioner provides some evidence supporting the similarity of the conditions at NWIPC to conditions common in criminal incarceration, but in large part focuses on her specific challenges to the conditions of her confinement.  *See* Dkt. 1-2.  As described above, the parties present very different depictions of the conditions at issue.  However, Respondents do not

1    dispute Petitioner's assertion that the conditions of detention at NWIPC are, as a general matter

2    and as previously found by this Court, similar to those in many prisons and jails.  The Court, as

3    such, finds that the conditions of detention factor weighs in Petitioner's favor.

4                    e.    Delays in removal proceedings:

5            Under the sixth and seventh factors, the Court considers "the nature and extent of any

6    delays in the removal proceedings caused by the petitioner and the government, respectively."

7    *Martinez*, 2019 WL 5968089 at *10.  "Petitioner is entitled to raise legitimate defenses to

8    removal . . . and such challenges to his removal cannot undermine his claim that detention has

9    become unreasonable."  *Barraza*, 2023 WL 9600946, at *6 (quoted source omitted).  Courts

10   may, however, consider the possibility of dilatory tactics on the part of a non-citizen.  *Id*. at *7.

11   Therefore, this factor "weighs against finding detention unreasonable when a non-citizen has

12   substantially prolonged his stay by abusing the processes provided, but not when he simply made

13   use of the statutorily permitted appeals process."  *Id*. (cleaned up; quoting *Hechavarria v.*

14   *Sessions*, 891 F.3d 49, 56 n.6 (2d Cir. 2018) (quoting *Nken v. Holder*, 556 U.S. 418, 436

15   (2009))).  With respect to the government:  "If immigration officials have caused delay, it weighs

16   in favor of finding continued detention unreasonable. . . .  Continued detention will also appear

17   more unreasonable when the delay in the proceedings was caused by the immigration court or

18   other non-ICE government officials."  *Sajous*, 2018 WL 2357266, at *10-11.

19           Petitioner argues that both of these factors weigh in her favor.  She acknowledges that she

20   was granted several continuances, first to obtain counsel and once for her counsel to adequately

21   prepare for a hearing, but denies that any of the continuances were in bad faith.  Dkt. 2 at 23-24

22   (citing Dkt. 1-3, ¶11).  She also identifies delays in the proceedings attributable to the

23   government, including the immigration court's decision to grant her a three-month continuance

1    when she requested only one month, and the re-calendaring of her individual hearing for over

2    three months due to a lack of docket space.  Respondents observe that, while they have not

3    requested any continuances, the removal proceedings have been continued a total of seven times,

4    either at the request of Petitioner or upon motion by her counsel.  Dkt. 9, ¶9.

5        The parties here identify delays attributable to both Petitioner and the immigration court.

6    The Court notes that one of the two delays attributed to the immigration court occurred only as a

7    result of one of Petitioner's seven requests to continue the proceedings, and that neither party

8    alleges the other has engaged in deliberate delay tactics.  Considering all of the information

9    provided, the Court finds the sixth and seventh factors, on balance, to be neutral.

10            f.    Likelihood removal proceedings will result in final order of removal:

11       The Court, finally, considers the likelihood that the removal proceedings will result in a

12   final order of removal.  "In other words, the Court considers whether the noncitizen has asserted

13   any defenses to removal."  *Martinez*, 2019 WL 5968089 at \*10.  "Where a noncitizen has not

14   asserted any grounds for relief from removal, presumably the noncitizen will be removed from

15   the United States, and continued detention will at least marginally serve the purpose of detention,

16   namely assuring the noncitizen is removed as ordered."  *Id*. at \*10.  "But where a noncitizen has

17   asserted a good faith challenge to removal, 'the categorical nature of the detention will become

18   increasingly unreasonable.'"  *Id*. (quoted source omitted).

19       Petitioner argues that the eighth factor strongly favors her because she has applied for

20   removal based on her fear of persecution, torture, and death at the hands of criminal syndicates

21   that have victimized her in the past.  *See* Dkt. 1-3, ¶11, 17, 30.  Petitioner adds that, if the

22   immigration court denies her application for protection, the BIA affirms that denial, and she

23   loses her LPR status, she intends to apply for a new U visa based on her possession of a U visa

1  certification.  *See* Dkt. 1-3, ¶¶30, 39, 41.  Respondents note that Petitioner has admitted to the

2  charges in the Notice to Appear, and that the IJ has not yet ruled on her application for relief

3  from removal.  Dkt. 9, ¶¶8, 10.  Respondents also note that Petitioner's possession of a U visa

4  certification does not guarantee she will, if requested in future, receive a U visa.  Respondents,

5  for these reasons, deem the eighth factor speculative.

6         The Court finds that, at this juncture, the record does not contain sufficient information to

7  allow the Court to make a prediction as to the likelihood either that Petitioner will succeed in

8  preventing her removal or that the removal proceedings will result in a final order of removal.  In

9  the absence of any evidence that Petitioner's applications for relief are frivolous or taken in bad

10 faith, the Court finds the eighth and final factor neutral.

11              g.    Weighing the factors:

12        As discussed above, two factors (i.e., length of detention to date and conditions of

13 detention) weigh in Petitioner's favor, two factors (i.e., the criminal history factors), weigh in

14 Respondents favor, and all of the remaining factors are neutral.  The Court also, as noted above,

15 finds it pertinent to consider the still early stages of Petitioner's immigration removal

16 proceedings and the possibility the immigration court could provide for her release.  The Court

17 concludes that, on balance, Petitioner does not show the law and facts clearly favor her position

18 that her detention has been unreasonably prolonged to the extent that it violates her due process

19 rights.  Given this conclusion, the Court does not find it necessary to consider the remaining

20 *Winter* factors in relation to Petitioner's request for a bond hearing.  *Garcia*, 786 F.3d at 740.

21                        CONCLUSION

22        The Court, in sum, concludes that Petitioner fails to meet her burden to demonstrate she

23 is entitled to mandatory injunctive relief in the form of either release from detention or a bond

1  hearing.  The Court thus recommends that Petitioner's Motion for a TRO, Dkt. 2, be DENIED.

2  A proposed Order accompanies this Report and Recommendation.

3  <u>OBJECTIONS</u>

4  Objections to this Report and Recommendation, if any, should be filed with the Clerk and

5  served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report

6  and Recommendation is signed.  Failure to file objections within the specified time may affect

7  your right to appeal.  Objections should be noted for consideration on the District Judge's

8  motions calendar for the third Friday after they are filed.  Responses to objections may be filed

9  within **fourteen (14)** days after service of objections.  If no timely objections are filed, the matter

10  will be ready for consideration by the District Judge on **<u>April 26, 2024</u>**.

11  Dated this 29th day of March, 2024.

13  S. KATE VAUGHAN
United States Magistrate Judge

REPORT AND RECOMMENDATION - 27